# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

———————

№ 95-CV-4599 (JFB)(CLP)
№ 97-CV-3687 (JFB)(CLP)

———————

ABDEL RAHEIM,

Plaintiff,

VERSUS

NEW YORK CITY BOARD OF EDUCATION, MS.
ELLIE GREENBERG, P.S. 4 SCHOOL PRINCIPAL,

Defendants.

———————

MEMORANDUM AND ORDER
August 17, 2006

———————

JOSEPH F. BIANCO, District Judge:

Plaintiff Abdel Raheim is a former employee of defendant New York City Board of Education (the "BOE"). In this consolidated case, Raheim, who is an Egyptian Muslim, contends that the BOE and defendant Greenberg violated his rights under Title VII by discriminating against him because of his religion and national origin by (1) firing him twice, (2) failing to hire him again, (3) failing to promote him, (4) failing to provide equal terms and conditions of employment, and (5) retaliating against him.

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure to dismiss both complaints in their entirety. For the reasons that follow, the motion for summary judgment is granted and the complaint is dismissed.

I. BACKGROUND

A. THE FACTS

The facts, construed in a light most favorable to plaintiff, the non-moving party, *see Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005), are as follows:[1]

---

[1] Plaintiff was proceeding *pro se* during the entirety of discovery and the initial briefing of this motion. On or about June 23, 2006, plaintiff's retained counsel filed a notice of appearance. On July 10, 2006, with leave of the Court, counsel for plaintiff filed supplemental papers. Because, however, plaintiff's counsel relies on the factual assertions and arguments of plaintiff from when he

was proceeding *pro se*, the Court will "construe the complaint broadly, and interpret it to raise the strongest arguments that it suggests." *Weixel v. Bd. of Educ. of the City of N.Y.*, 287 F.3d 138, 145-46 (2d Cir. 2002) (quoting *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000)). Notwithstanding plaintiff's *pro se* status at the time of its filing, the Court notes that plaintiff utterly failed to comply with Local Rule 56.1, which requires parties to submit "short and concise statement[s]" that "must be followed by citation to evidence which would be admissible." (Local R. 56.1.) As just one example, defendants make the unremarkable assertion that "plaintiff was hired by defendant principal Greenberg to fill a vacancy at P.S. 4 in September 1990. Plaintiff served as a common branches bilingual (Arabic) regular substitute teacher." (Defs.' 56.1 Statement ¶ 2.) Rather than admit to this fact, or controvert it by submitting his own evidence, plaintiff writes for nearly three pages about Greenberg's qualifications, and about other "orders" from Greenberg after he was hired at P.S. 4. (*See* Pl.'s Resp. to Defs.' 56.1 Statement ¶ 2, at 2-4 ("Pl.'s 56.1 Resp.").) After three pages, plaintiff alleges that he objects to defendants' assertion that "plaintiff served as a common branches bilingual (Arabic) regular substitute teacher." (*Id.*) As evidence of his "objection," plaintiff submits a letter from DOE that shows he was a "full-time regular substitute teacher." (*See* Pl.'s 56.1 Resp. Ex. 2.) Although plaintiff argues this "shows an inference of discrimination," it is not clear what the difference is between the defendants' and plaintiff's evidence, or how such a difference, if any, is relevant to the facts at issue in this case. Thus, although the Court will draw every inference in plaintiff's favor, *see Pender v. State of N.Y. Office of Mental Retardation and Developmental Disabilities*, No. 02-CV-2438 (JFB) (LB), 2006 WL 2013863, at *1 (E.D.N.Y. July 18, 2006) (overlooking *pro se* plaintiff's failure to comply with Local Rule 56.1 when there is evidence in the record to support plaintiff's position and citing cases), the Court rejects plaintiff's "conclusory allegations or denials" to defendants' 56.1 statement that are not based in the record. *See R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984).

[2] Plaintiff's response to defendants' 56.1 statement that plaintiff is an Egyptian Muslim states that "defendants used the plaintiff's national origin, religion and his arabic license of permanent employment on its summary judgment in a fraudulent and deceptive misrepresentation, which violated Title VII . . . ." (Pl.'s 56.1 Resp. ¶ 1 (citing to plaintiff's birth certificate).) The Court is dumbfounded as to what, if anything, plaintiff is objecting to, as defendants merely cite to the first complaint filed by plaintiff in this case. In any event, there is no question that Raheim is claiming discrimination based on his Egyptian origin and his religion, which he claimed in both of his complaints as "Muslim." (*See* Compl. ¶ 9.)

1. Raheim's Background, Employment, and Dismissal From P.S. 4

Raheim was born in Egypt, and is a Muslim.[2] (Defs.' 56.1 Statement ¶ 1.) Raheim is a bilingual teacher who speaks Arabic. (*Id.*)

Raheim was hired by defendant Greenberg and the BOE to work as a substitute teacher at P.S. 4 in September 1990. (*Id.* ¶ 2; Pl.'s 56.1 Resp. ¶ 2.) Greenberg, a Roman Catholic, was the principal at P.S. 4 during Raheim's employment. (Defs.' 56.1 Statement ¶¶ 2, 8.)

On November 13, 1990, Greenberg visited Raheim's classroom to observe his performance. (*Id.* ¶ 3.) On that day, there were approximately twelve students in Raheim's classroom and no assistant teacher, even though there is supposed to be an assistant whenever there are more than ten students in the classroom. (Pl.'s 56.1 Resp. ¶ 3.) In a written report dated November 19, 1990, Greenberg gave Raheim an unsatisfactory report. (*See* Defs.' 56.1 Statement ¶¶ 3, 4, Ex. F.) In Greenberg's report, she wrote, *inter alia*, that she observed

Raheim "physically restraining a child, [and] mark[ing] that [student's] work was correct when it was [not]." (*Id.* Ex. F.) Greenberg also observed "inappropriate behavior displayed by the students . . . [and] no consistent management plan." (*Id.*) Raheim signed the unsatisfactory evaluation report. (*Id.*) Raheim claims in his 56.1 response that Greenberg "deleted" certain portions of the evaluation, *see* Pl.'s 56.1 Resp. ¶ 4, but he does not indicate when or in what context Greenberg deleted the references in this report. In any event, Raheim does not contest that he was shown the report or that he signed it.³ (*Id.*)

On November 13, 1990, Greenberg wrote a letter to Raheim informing him P.S. 4 "no longer requires your services effective November 30, 1990." (Pl.'s 56.1 Resp. Ex. 3) Raheim was fired from his position at P.S. 4 on November 30, 1990. (Defs.' 56.1 Statement ¶ 6.)

As part of Raheim's opposition papers, he submitted a "Daily Memo" dated November 26, 1990, that he claims was written by Greenberg. The Daily Memo appears to contain a number of announcements for the day, and states, in part, that "Mr Raheim will be assisting in both gym classes today." (Pl.'s 56.1 Resp. Ex. 6.) Raheim argues that this was done by Greenberg to "humiliate" him "in front [sic] the school teachers" because his position at P.S. 4 was that of a "teacher and not an assistant teacher." (*Id.* ¶ 6.)

A per diem teacher, "Ms. Aisiku," was hired by Greenberg at P.S. 4 as a substitute teacher at some point before Raheim was fired. (Pl.'s Dep. at 49-50.) After Raheim was fired, Aisiku took over Raheim's classroom. (*Id.* at 50-51.) According to Raheim, Aisiku is a "black American" and Greenberg's "girl friend" (*Id.* at 50; Pl.'s Opp. Mem. at 12.) Raheim submits that of the twenty-four employees at P.S. 4 when he was there, twenty-two were women, which he argues shows Greenberg's "racial policy." (Pl.'s 56.1 Resp. ¶ 7, at 11.)

On or about May 8, 1991, Raheim filed a charge of discrimination with the New York State Division of Human Rights ("NYSDHR") relating to the 1990 termination. (Defs.' 56.1 Statement ¶ 9; Pl.'s 56.1 Resp. ¶ 9.) On April 13, 1995, the NYSDHR issued a no probable cause determination. (Defs.' 56.1 Statement ¶ 10.)

2. Raheim Grieves His Dismissal From P.S. 4

After Raheim was fired from P.S. 4, he filed a grievance with the BOE alleging that, after he was fired, he was not appointed to an open position elsewhere, in violation of the collective bargaining agreement between the Union and the BOE. (Defs.' 56.1 Statement ¶ 13, Ex. L.) Raheim claims that, in April 1991, P.S. 102 was seeking an Arabic teacher. According to Raheim, Gary Barton, Deputy Executive Director of the BOE, refused to give him a letter allowing him to be appointed to the teaching position at P.S. 102. (Pl.'s 56.1 Resp. ¶ 13.) Instead, Barton wanted Raheim to serve as a substitute teacher. (*Id.*)

---

³ At the bottom of the first page of Greenberg's evaluation report, there is a handwritten notation, written by Raheim, that reads: "your feeling about me reflects your race and creed. I was working in my room with out para. True statement will be attached to this." (*See* Defs.' 56.1 Ex. F; Pl.'s 56.1 Resp. ¶ 5.) Raheim states that Greenberg "deleted my statement mentioned to her fabricated written report." (*Id.*) Raheim does not, however, submit any evidence addressing what statement he is referring to, what the statement said, or any evidence addressing what portion of Greenberg's report is "fabricated."

3

By letter dated September 22, 1991, Raheim was informed by the BOE that (1) although he had interviewed for the position, the district did not want to employ him; (2) he was not eligible for the position because he had not been appointed in accordance with the BOE's agreements with the Union; and (3) even if he was eligible, he does not have any contractual right to be appointed to a specific school. (*Id.* Ex. 20.)

On December 16, 1992, Raheim's Union agreed to grieve the BOE's failure to place Raheim in a permanent position. (*Id.* ¶ 13.) Following a hearing, on or about February 1, 1993, the BOE, the Union, and Raheim entered into an agreement whereby Raheim would be assigned as a "regular substitute" to fill the vacancy at P.S. 102. (*Id.* Ex. 14.) In return, Raheim agreed to withdraw the grievance. (*Id.*)

### 3. Raheim's Employment and Dismissal From P.S. 102

On or about February 1, 1993, Raheim was hired as a regular substitute teacher at P.S. 102. (Defs.' 56.1 Statement ¶ 15.)

#### a. Allegations of Sexual Harassment

While Raheim was employed at P.S. 102, several female staff members made allegations that he engaged in inappropriate conduct by making unwelcome sexual advances towards them. (*Id.* ¶ 16.) According to a letter from the BOE Community Superintendent to Raheim, four women complained about inappropriate conduct by Raheim. (*Id.* Ex. Q.) Specifically, (1) the P.S. 102 school secretary complained that Raheim tried to kiss her, and that she told him to stop; (2) a teacher complained that Raheim repeatedly put his arms on her shoulder and patted her back; (3) a secretary complained that Raheim rubbed her back after she gave him his paycheck; and (4) an assistant principal complained of several incidents involving gifts and cards from Raheim, unwanted touching, and inappropriate conversations about "love between a man and a woman." (*Id.*) According to the letter outlining the complaints, when Raheim was questioned about these incidents, he stated to the investigators that he was just trying to be friendly and was show appreciation. (*Id.*) Raheim signed the letter and wrote "answers will follow" below his signature. (*Id.*)

Plaintiff's reply to defendant's 56.1 statement concerning allegations of his inappropriate conduct and unwelcome sexual advances goes on for six pages. (*See* Pl.'s 56.1 Resp. ¶ 16, at 21-27.) In his reply, however, he does not deny that the allegations were made. Instead, he disputes them and describes an acrimonious relationship with one of the complainants, his supervisor Theresa Dovi. (*Id.*) In particular, Raheim submits a letter from Dovi to the Principal of P.S. 102 wherein Dovi states that Raheim gave Dovi a sterling silver chain and two decorative dishes, along with a card that "spoke of the love a husband has for his wife." (*Id.* Ex. 16.) According to the letter, Dovi returned the gifts to Raheim. In addition, the letter describes an incident in May 1993 where Raheim "put his arm on [Dovi's] shoulder and also proceeded to rub [Dovi's] back." (*Id.*) According to the letter, Dovi reported the incident to the school Principal and informed Raheim that she did not appreciate him putting his arms on her. (*Id.*) Finally, the letter describes a telephone call between Raheim and Dovi that was overheard by a third person wherein Raheim allegedly spoke about "love between a man and a woman." (*Id.*)

4

The incidents described by Dovi were later part of an investigation by the NYSDHR, where Dovi restated in substance the allegations described in the letter to the P.S. 102 Principal, in addition to other incidents involving allegedly inappropriate conduct by Raheim. (*Id.* Ex. 16.)

Raheim disputes that he sexually harassed the four women at P.S. 102. He describes the letter written by Dovi as "false allegations," and that "Dovi had not showed [sic] any emotional distress of such substantial quantity or enduring quality that 'no person in a civilized society should be expected to endure it.'" (*Id.* ¶ 16.) Raheim goes on to assert, without submitting any admissible evidence, that the other females who submitted written complaints about his actions were "forced by Dovi" to complain. (*Id.*)

b. Allegations of Cheating on Standardized Tests and Corporal Punishment by Raheim

On or about June 17, 1993, two investigators from the BOE made a site visit to P.S. 102 in response to an allegation of a breach of citywide testing protocol. (Defs.' 56.1 Statement Ex. R.) The investigation determined the following:

> Seven students from [Raheim's class] said that Mr. Raheim read each test to the class. Students raised their hands and provided an answer for each problem. If the student gave a right answer, Mr. Raheim would instruct the class to bubble in the correct answer. If the answer given was wrong, Mr. Raheim would provide the class with the right answer.

(*Id.*) Raheim's 56.1 response states that he has been teaching since 1967 in private and public schools, and he had never before been accused of cheating on city or state-wide tests. (Pl.'s 56.1 Resp. ¶ 17.) He states that "teachers should make certain that students darken bubbles and completely erase errors and stray marks." (*Id.*) He also claims that he was not accused of cheating on several other test dates in 1993, and that his students were not provided the proper English speaking programs to allow them to pass the various tests. (*Id.*) Raheim claims that the P.S. 102 Principal "did not mention any words concerning the allegations of cheating on the English-speaking citywide tests of reading and math of 1993 on his notice of termination . . . which confirms the defendants' false and fraudulent representations."[4] (*Id.*) Raheim submitted handwritten notes from several students, some accusing him of cheating, and some saying he did not cheat. (*Id.* Ex. 18.) In addition, Raheim suggests that an apparent inconsistency in the investigator's report – that he had been working as the students' teacher since September 1992 instead of February 1, 1993 – is evidence of the investigator's "knowledge of falsity." (*Id.* ¶ 18.)

In addition to the allegations that Raheim cheated on city-wide tests, the investigators reported that they learned in their investigation that two third-grade students

---

[4] It is not clear what Raheim is referring to with this statement. Indeed, Raheim cites to Exhibit 16, which includes, *inter alia*, a June 23, 1993 "Notice and Report Termination of Unsatisfactory Substitute Service" from his P.S. 102 Principal. In the notice and report, he is fired "based on the findings . . . with regard to your use of corporal punishment on June 15, 1993 and cheating on the citywide reading and mathematics tests given in 1993." (Pl.'s 56.1 Resp. Ex. 16.) Thus, notwithstanding Raheim's 56.1 response to the contrary, the P.S. 102 Principal did "mention . . . words concerning the allegations of cheating" on Raheim's notice of termination.

5

witnessed Raheim "slap Student A on the face on June 15, 1993." (Defs.' 56.1 Statement Ex. R.) As a result of this report, the investigators interviewed students from Raheim's class, including Student A. Student A reported to the investigators that Raheim

> [S]lapped his face because he was talking to his friends. Mr. Abdel-Raheim punches him in the arm every day. Mr. Abdel-Raheim calls his home and tells his parents that he is bad, fights, curses, and bothers other students. As a result, his parents have placed him on punishment.

(*Id.*) In addition to Student A, seven other students, including six from Raheim's class, stated to investigators that they had witnessed Raheim hit Student A during the school year. (*Id.*) These students also reported to the investigators that Raheim "calls them animals and screams at them." (*Id.*) The investigators reported that they spoke with Raheim about the allegations, and he denied them. (*Id.*)

Raheim denies that he was asked about the incident involving Student A, *see* Pl.'s 56.1 Resp. ¶ 18, and submits that there is no evidence that an ambulance was ever called to the school or that any parents ever complained. Raheim also quotes from a 1992 memorandum addressing corporal punishment that allows for reasonable physical force by a teacher (1) in self-defense, (2) to protect another teacher, student, or school property, or (3) to restrain or remove a student under certain circumstances. (*Id.*) Raheim also submits evidence from an administrative law judge from the New York State Department of Labor who concluded after a hearing that "the only person who had direct knowledge of what actually did occur who appeared at the hearing was the claimant. I therefore find that [Raheim] did not strike any of the children."

(*Id.*) Finally, Raheim contends that "the Supreme Court has upheld the use of reasonable corporal punishment in schools." (*Id.*)

On June 16, 1993, Raheim was summoned to the Superintendent's office. (*Id.* ¶ 21; Ex. 21.) From June 17, 1993 until June 28, 1993, Raheim was required to sit in the hallway, allegedly "to humiliate me in front [of the superintendent's] visitors." (*Id.* ¶ 21.) At this time, Raheim's Saturday Arabic class was cancelled because of the on-going investigation. (*Id.*)

On June 23, 1993, the BOE informed Raheim that, because of the results of the investigation regarding cheating (a claim he continued to deny), he was being fired. (Defs.' 56.1 Statement Ex. U; Pl.'s 56.1 Resp. ¶ 20.) In a separate letter, also dated June 23, 1993, P.S. 104's Principal fired Raheim because of the results of the investigation into his alleged use of corporal punishment. (Defs.' 56.1 Statement ¶ 21.) The Principal also informed Raheim that he was recommending revocation or cancellation of Raheim's teaching license. (*Id.*)

Following Raheim's dismissal, the BOE Office of Appeals and Reviews held an informal conference to discuss the allegations concerning Raheim's use of corporal punishment. (Defs.' 56.1 Statement Ex. W.) Based on this informal conference and a review of the investigation, the BOE Office of Appeals and Reviews concluded that Raheim did commit corporal punishment. (*Id.*) Because Raheim had already been fired, the office of appeals and reviews closed the case. (*Id.*) Raheim did not attend the informal conference, but was informed of the Office of Appeals and Reviews' decision by letter dated November 24, 1993. (*Id.*; Pl.'s 56.1 Resp. ¶ 22.)

6

In addition to losing his position as a substitute teacher at P.S. 102, Raheim's permit to use P.S. 102 on the weekend was also cancelled. (Pl.'s 56.1 Resp. Ex. 21.) By letter dated November 10, 1993, the BOE informed Raheim's attorney at the time that "it has been determined by the Office of Legal Services that [Raheim] should be removed from contact with *all* children. Based on that decision, we cannot allow Mr. Raheim to come into contact with children on [the] BOE property *at any time*, even in his capacity as President of the Arab-American Educational Community." (*Id.*)

On or about December 22, 1993, Raheim filed a charge of discrimination with the NYSDHR relating to his 1993 dismissal from P.S. 102, alleging his dismissal was the result of discrimination based on "creed, national origin, and race/color." (Defs.' 56.1 Statement Ex. BB.) On or about May 26, 1995, the NYSDHR issued a no probable cause determination. (*Id.*)

### B. RAHEIM'S DISCOVERY DISPUTE

At oral argument on July 19, 2006, plaintiff made several allegations concerning alleged outstanding discovery. Magistrate Judge Pollack closed discovery on or about July 26, 2004, subject to certain production by the BOE. (*See* July 26, 2004 Order.) Notwithstanding the fact that discovery had been closed for nearly two years, and no appeal of Magistrate Judge Pollack's discovery order had been filed, this Court afforded plaintiff the opportunity to submit a letter detailing the outstanding discovery. In that letter, plaintiff alleges that he was entitled to the following: (1) a June 28, 1996 memorandum from Mr. Ryan to Mr. Spence; (2) a letter from the BOE informing the Executive Director of Human Resources of Mr. Ryan's retirement; (3) the name of the licensed Arabic teacher terminated by the BOE; (4) an explanation from the BOE as to why items five, thirteen, and fourteen of the defendants' June 22, 2004 were not produced; and (5) depositions by plaintiff of various witnesses.

By letter dated August 4, 2006, counsel for defendants detailed the discovery history of the materials plaintiff claims he never received. Defendants' counsel sent plaintiff a letter on August 6, 2004, attaching the documents required by Magistrate Judge Pollack's July 26, 2004 Order. As to plaintiff's complaint about relevant depositions, as detailed in defendants' August 4, 2006 letter, plaintiff was afforded the opportunity to depose witnesses, and chose not to. Further, plaintiff did not submit any letters, or complain to Magistrate Judge Pollack, about defendants failing to comply with her discovery order.

As discovery has been closed for over two years, and because defendants complied with Magistrate Judge Pollack's discovery orders, plaintiffs' request for more discovery, is denied.

### C. THE INSTANT ACTION

Plaintiff filed two separate complaints, on November 8, 1995, and June 26, 1997, alleging the BOE violated his rights and discriminated against him in violation of Title VII. The complaint, filed on November 8, 1995, also names Greenberg as a defendant. The cases were consolidated before the Honorable Nina Gershon. After a lengthy discovery process, defendants moved for summary judgment on August 11, 2005. On February 10, 2006, this case was reassigned to this Court. Oral argument was originally scheduled for April 18, 2006, but was

7

adjourned twice at the request of plaintiff. On July 19, 2006, oral argument was held.

## II. DISCUSSION

Plaintiff claims that the BOE engaged in a pattern of discrimination against him and that the incidents and investigations that led to his dismissal from P.S. 4 and P.S. 102 were a pretext for the real reason the BOE fired him – because he is Egyptian or because he is Muslim.

The difficulty with plaintiff's position is that the BOE has submitted overwhelming evidence to show that plaintiff was fired from P.S. 4 based on an unsatisfactory rating, and that he was fired from P.S. 102 because of a series of complaints from students stating that he engaged in corporal punishment and helped them cheat on standardized tests, and from female teachers stating that he engaged in inappropriate conduct at work. Plaintiff has failed to submit *any* evidence tending to show that the real reason he was fired was because of his religion or national origin. In addition, the claims against defendant Greenberg must be dismissed because an individual is not liable for employment discrimination under Title VII.

Plaintiff's other contentions, that he was not re-hired or promoted to an available position, and that he was denied equal terms and conditions of employment, are also without merit.

Thus, defendants' motion for summary judgment is granted, for no reasonable jury could find that plaintiff was discriminated against because he is Egyptian or because he is Muslim. After discussing the applicable standards for summary judgment, the Court addresses plaintiff's Title VII claims.

### A. SUMMARY JUDGMENT STANDARD

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50

8

(citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *Tufariello v. Long Island R.R. Co.*, 364 F. Supp. 2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted). The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g., Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

### B. PLAINTIFF'S DISCRIMINATION CLAIMS AGAINST DEFENDANT GREENBERG

Plaintiff has brought suit directly against Greenberg for violating Title VII. It is well-settled in the Second Circuit, however, that individuals are not subject to liability under Title VII. *See County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004); *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74-75 (2d Cir. 2000); *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995) (holding that "individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII"), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

In plaintiff's opposition papers, he appears to concede that he cannot recover against Greenberg – indeed, he argues that his claims are against the BOE and not Greenberg as an individual. (*See* Pl.'s Opp. at 5-6). On the other hand, he clearly named Greenberg as a defendant in his 1995 complaint. Plaintiff's counsel conceded at oral argument that plaintiff was withdrawing claims against Greenberg in her individual capacity. In any event, as Greenberg is an individual and individuals are not subject to liability under Title VII, to the extent *pro se* plaintiff wishes to pursue these claims against Greenberg, those claims are dismissed.

C. RAHEIM'S DISCRIMINATION CLAIMS
AGAINST THE BOE

a. Applicable Law

Title VII prohibits discrimination of an employee based on his religion or national origin. *See* 42 U.S.C. § 2000e-2(a). Here, plaintiff claims he was fired twice, not re-hired or promoted, and denied equal terms and conditions of employment on the basis of his religion and national origin.

The "ultimate issue" in any employment discrimination case is whether the plaintiff has met his burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," i.e., that there was discriminatory intent. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146 (2000); *Fields v. N.Y. State Office of Mental Retardation & Dev'l Disabilities*, 115 F.3d 116, 119 (2d Cir. 1997). In the absence of direct evidence of discrimination, a plaintiff in an employment discrimination case usually relies on the three-step McDonnell Douglas test. First, a plaintiff must establish a prima facie case of unlawful discrimination by showing that (1) he is a member of a protected class (2) who performed his job satisfactorily (or who was qualified for a new position or job) (3) but suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination (or retaliation). *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 802 n.13 (1973) (noting that elements of prima facie case vary depending on factual circumstances); *Stratton v. Dep't for the Aging for the City of N.Y.*, 132 F.3d 869, 879 (2d Cir. 1997).

Second, if the plaintiff establishes a prima facie case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision." *Stratton*, 132 F.3d at 879; *see Reeves*, 530 U.S. at 142-43. The purpose of this step is "to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Fisher v. Vassar College*, 114 F.3d 1332, 1335-36 (2d Cir. 1997) (en banc).

Third, if the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993) (citation omitted); *see James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. *See Fields*, 115 F.3d at 120-21; *Connell v. Consol. Edison Co.*, 109 F. Supp. 2d 202, 207 (S.D.N.Y. 2000).

To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that he satisfies "McDonnell Douglas's minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James*, 233 F.3d at 157. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an

inference of discrimination. *See id.*; *Connell*, 109 F. Supp. 2d at 207-08.

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove – particularly discrimination." 233 F.3d at 157; *see Lapsley v. Columbia Univ.*, 999 F. Supp. 506, 513-16 (S.D.N.Y. 1998) (advocating elimination of McDonnell Douglas test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination); *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

b. Raheim's Dismissal From P.S. 4

The Court assumes that plaintiff has demonstrated a *prima facie* case of discrimination regarding his dismissal from P.S. 4.[5] The BOE has articulated a legitimate non-discriminatory reason for firing Raheim. Hence, the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find that he was fired because he is Egyptian or Muslim, realizing the elusiveness of proof of discrimination and the principle that the jury is "entitled to view the evidence as a whole." *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir. 1997); *see also Siano v. Haber*, 40 F. Supp. 2d 516, 520 (S.D.N.Y.), *aff'd mem.*, 201 F.3d 432, 1999 WL 1295923 (2d Cir. 1999).

Raheim submits that he was fired from P.S. 4 because of his religion and national origin. In support of this, he submits the following evidence: (1) that his supervisor, Greenberg "and/or her husband" are Jewish, and that one or more individuals at the BOE who made decisions about his employment are Jewish; (2) that twenty-two of the twenty-four employees at P.S. 4 were women; (3) that the BOE violated Union rules by firing him after only one unsatisfactory performance appraisal; (4) that Greenberg fired him so her "girl friend" "Ms. Aisiku" could take over plaintiff's class; and (5) that Greenberg displayed discriminatory animus toward him by writing on a Daily Memo on November 26, 1990, that he would "be assisting in both gym classes today." (Pl.'s 56.1 Resp. ¶ 6, Ex. 6.)

---

[5] There is an argument that Raheim failed to demonstrate a *prima facie* case. Raheim was fired less than three months after starting as a teacher at P.S. 4 for receiving an unsatisfactory rating. Thus, there is some support that he fails prong two ("performing his job satisfactorily"). *See Gregory v. Daly*, 243 F.3d 687, 696 n.7 (2d Cir. 2001) ("Of course, there will also be circumstances in which a plaintiff's performance is so manifestly poor as to render [him] unqualified for continued employment and thereby defeat [his] *prima facie* case."); *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997) (affirming summary judgment finding that no *prima facie* case had been demonstrated where the employer rated plaintiff's work unsatisfactory on a majority of criteria and plaintiff did not contest most of these ratings). On the other hand, Raheim asserts that he had been teaching for several years prior to his employment at P.S. 4, and had consistently received adequate performance appraisals. Thus, the Court finds he has made the "minimal showing" that he "'possesses the basic skills necessary for performance of [the] job'" to satisfy prong two of his *prima facie* case. *Gregory*, 243 F.3d at 696 (quoting *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 (2d Cir. 1991) (internal quotation omitted)).

The BOE argues that plaintiff was fired because he received an unsatisfactory performance review after Greenberg conducted an on-site visit.

Looking at the evidence as a whole, the Court finds that plaintiff's evidence of discrimination by the BOE fails to raise an issue of fact to survive summary judgment. Raheim argues that an inference of discrimination exists because Greenberg, her husband, and others at the BOE are Jewish. As a threshold matter, Greenberg is not Jewish; rather, she is Roman Catholic. Moreover, Greenberg's husband has absolutely nothing to do with this case. Even if, however, Greenberg and other officials at the BOE are Jewish, that fact, by itself, proves nothing. There is simply insufficient evidence from which a rational jury could find discriminatory intent. *See Lizardo v. Denny's, Inc.*, 270 F.3d 94, 103-04 (2d Cir. 2001). Here, the "record is barren of any direct evidence" of animosity by Greenberg against plaintiff based on his national origin and his religion. *Id*. There is also no circumstantial evidence of discrimination. *See Norton*, 145 F.2d at 119. Greenberg hired Raheim in September 1990, and then fired him in November 1990, only two months later. This "same actor" inference significantly undermines plaintiff's claim of discriminatory animus by Greenberg. *See Grady v. Affiliated Cent. Inc.*, 130 F.3d 553, 560 (2d Cir. 1997); *Pronin v. Raffi Custom Photo Lab, Inc.*, 383 F. Supp. 2d 628, 639 (S.D.N.Y. 2005). As the Second Circuit noted, "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Grady*, 130 F.3d at 560. Further, the hiring and firing decisions were made within two months of each other. *See id.* (same actor inference is even stronger "when the firing has occurred only a short time after the hiring"); *see also Carlton v. Mystic Trans., Inc.*, 202 F.3d 129, 138 (2d Cir. 2000) (where an individual is discharged within a relatively short time after his or her hiring, "there is a strong inference that discrimination was not a motivating factor in the employment decision"); *Pronin*, 383 F. Supp. 2d at 639-40.

Plaintiff's complaint and the arguments in his pleadings ask this Court to infer discrimination because Greenberg and others at the BOE may be Jewish. The Court rejects this invitation without evidence showing discriminatory animus by the BOE. *Lizardo*, 270 F.3d at 104 (holding that it is not enough for a plaintiff to "cite to [his] mistreatment and ask the Court to conclude that it must have been related" to discrimination). There is simply no support for the proposition that the religion or race of a supervisor, standing alone, gives rise to an inference of discrimination. Plaintiff's argument is all the more lacking because, as noted above, Greenberg is Roman Catholic.

Raheim also submits, as evidence of discrimination by Greenberg and the BOE, the fact that twenty-two of the twenty-four employees at P.S. 4 were women. If anything, this would support a gender discrimination claim. Raheim has not accused the BOE of discrimination based on his gender. Therefore, this evidence, even if true, does not support a claim of discrimination based on national origin or religion.

Raheim's argument that under Union rules he was entitled to a second review before being terminated is also unavailing. As evidence of this, plaintiff submits two pages from a BOE "Regulations and Proceeding" manual. (*See* Pl.'s Ex. 4.) The portion submitted states, *inter alia*, "the following *minimum* number of required classroom observations is recommended." (*Id.*) For full-time substitutes, it recommends two full

period evaluations by the principal in schools where there is no assistant principal, and in schools where there is an assistant principal, one full period evaluation by the principal, and one full period evaluation by the assistant principal. (*Id.*) Plaintiff does not, however, submit any evidence showing that the "recommended" observation schedule was a *requirement* prior to a decision to terminate a substitute teacher such as plaintiff. Thus, the fact that Greenberg fired Raheim after only one, rather than two, classroom evaluations, does not raise an issue of fact precluding summary judgment.[6]

Indeed, even if plaintiff's position is accepted, that the Union rules were violated by Greenberg, it does not change the fact that his dismissal was based on his unsatisfactory review and not based on his religion or national origin. The uncontroverted evidence submitted by the BOE is that plaintiff was fired for receiving an unsatisfactory performance review after Greenberg conducted an on-site visit. Plaintiff does not dispute that Greenberg conducted an on-site visit or that he received an unsatisfactory review based on that visit. Hence, even if plaintiff is correct that his dismissal was in violation of the BOE's agreement with the Union, he still fails to show that this was pretextual. *See Lizardo*, 270 F.3d at 104 ("If, as plaintiff[] contend[s], the defendants exaggerated or lied about plaintiff's behavior, the record does not support a finding that they did so to mask race discrimination."); *James*, 233 F.3d at 157.

Further, plaintiff's contention that he was fired by Greenberg so that Greenberg could replace him with her "girl friend" "Ms. Aisiku" does not support his claim of discrimination. Even if plaintiff's assertion is true, it points to a non-discriminatory reason for Greenberg's actions, not evidence of discrimination based on plaintiff's religion or national origin. *See Cianfrano v. Babbitt*, 851 F. Supp. 41, 48 (N.D.N.Y. 1994) (stating that an employer's stated reason may be "'a good reason, a bad reason, a reason based on erroneous facts, or . . . no reason at all, as long as its action is not for discriminatory reasons.'") (quoting *Nix v. WLCY Radio/Rahall Commc'n*, 738 F.2d 1181, 1187 (11th Cir. 1984)).

Finally, Raheim argues that Greenberg tried to "humiliate" him by writing in a daily memorandum that Raheim would be "assisting in both gym classes today." (Pl.'s 56.1 Resp. Ex. 6.) Again, this evidence fails to raise an issue of fact for a jury. Plaintiff's contention that Greenberg was trying to humiliate him because he is a "teacher" and not an "assistant" is not only unsupported by the evidence, but also does not show animus by Greenberg based on Raheim's religion or national origin. Not only has Raheim failed to show how the Daily Memo by Greenberg shows racial animus, he does not even show how it was humiliating to him. Indeed, this Court "cannot infer discrimination from thin air" based on Raheim's conclusory allegations that Greenberg humiliated him. *Norton*, 145 F.2d at 119; *James*, 233 F.3d at 157.

No reasonable jury could find that plaintiff was fired from P.S. 4 because of his national origin or religion. Based on the evidence submitted, the only rational conclusion is that Raheim was fired from P.S. 4 based on an

---

[6] In Plaintiff's Supplemental Memorandum, and at oral argument, plaintiff argued that he was entitled to a BOE hearing prior to its decision to fire him. Plaintiff fails, however, to direct this Court to any evidence in the record showing that an employee in plaintiff's position was entitled to a hearing. Even assuming *arguendo* that plaintiff was entitled to a hearing, plaintiff has submitted no evidence that BOE's failure to give him a hearing was based on discriminatory animus.

unsatisfactory performance rating following Greenberg's visit to plaintiff's classroom. Hence, Raheim's claims alleging discrimination against the BOE based on his dismissal from P.S. 4 are dismissed.

### c. Raheim's Failure to Hire and Failure to Promote Claims

With respect to a discriminatory failure to hire or promote claim, the McDonnell Douglas test again applies. Thus, plaintiff must first establish a *prima facie* case of unlawful discrimination by showing that (1) he is a member of a protected category, (2) he applied for an available position, (3) he was qualified for the position, and (4) he was rejected under circumstances that give rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 (2d Cir. 2000). "An inference of discrimination may arise if the position remains open and the employer continues to seek applicants of the plaintiff's qualifications [ ] or if the position was filled by someone not a member of plaintiff's protected class." *Gomez v. Pellicone*, 986 F. Supp. 220, 228 (S.D.N.Y. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802).

Again, the Court assumes that Raheim has demonstrated a *prima facie* case of discrimination regarding the BOE's failure to hire him in 1991 to an available teaching position at P.S. 102. The BOE has articulated a legitimate non-discriminatory reason for not hiring or promoting Raheim.

Raheim argues that because there was an available position at P.S. 102, and he was not hired to fill that position, that it must be because the BOE has discriminatory animus towards him. Even viewing all the evidence in a light most favorable to Raheim, there is nothing in the record to support this contention. The evidence, and even the complaints in this case, fail to show that the decision not to hire Raheim was based on Raheim's religion or national origin. As alleged, and as was shown in discovery, Raheim tried to find permanent employment at the BOE by filling a position at P.S. 102. He was not hired for that position because: (1) he was not eligible under the Union's contract with the BOE; (2) after the interview, the district where P.S. 102 is located chose not to hire him; and (3) under the Union's contract with the BOE, there is no obligation for the BOE to place him in a school of his choosing. (*See* Pl.'s 56.1 Resp. Ex. 20). Raheim does not contest any of these facts, nor does he submit any evidence to support the unsubstantiated allegation that these decisions were made because plaintiff is Egyptian or Muslim. *See Norton*, 145 F.2d at 119. Nowhere in the evidence submitted is there any support for Raheim's conclusory allegations that the BOE did not initially hire or promote him to a teaching position at P.S. 102 because of discriminatory animus.

Hence, summary judgment is granted in favor of the BOE, for no reasonable jury could find that plaintiff was not hired as a permanent teacher at P.S. 102 because he is Egyptian or because he is Muslim.

### d. Unequal Terms and Conditions of Employment

Raheim alleges in both of his complaints that the BOE subjected him to unequal terms and conditions of employment because he is an Egyptian Muslim.[7] Although plaintiff can

---

[7] Plaintiff filed an Eastern District of New York form employment discrimination complaint. On that form, plaintiff checked the box alleging "unequal terms and conditions of employment." Other than checking the box, it does not appear from the papers submitted by either party that plaintiff is still pursuing this claim. Nevertheless, the Court addresses the claim herein.

14

establish for purposes of his *prima facie* case that he is Egyptian and a Muslim, and that he was qualified to work for the BOE, there is no evidence in the record before the Court from which a jury could conclude that plaintiff received unequal terms and conditions of employment, much less evidence that the BOE subjected him to such treatment because of his religion or national origin. Indeed, even construing Raheim's pleading and motion papers liberally, there is no discernable basis for this claim. There is no evidence that he received less pay, that he was denied training opportunities, or that his job requirements or work load were affected because of his religion or national origin. Further, even if the BOE did subject plaintiff to unequal terms and conditions of employment, there is no basis for any finding by a reasonable jury that plaintiff received such treatment because he is Egyptian or because he is Muslim. Accordingly, the BOE is entitled to summary judgment on this claim.

e. Raheim's Dismissal From P.S. 102

The Court assumes that Raheim has demonstrated a *prima facie* case of discrimination regarding his dismissal from P.S. 102. The BOE has articulated a legitimate non-discriminatory reason for firing Raheim. Again, the Court proceeds directly to the ultimate question of whether Raheim has presented sufficient evidence from which a reasonable jury could find that he was fired because he is Egyptian or because he is Muslim. *See Stern*, 131 F.3d at 314 (2d Cir. 1997).

Raheim submits that he was fired from P.S. 102 because of his religion and national origin, and in retaliation for filing a complaint with the NYSDHR. BOE, on the other hand, submits evidence showing that plaintiff was fired because of three different reasons: (1) several female staff members made allegations that he had engaged in inappropriate conduct by making unwelcome sexual advances towards them; (2) an investigation revealed that he helped students cheat on standardized tests; and (3) an investigation revealed that he had engaged in corporal punishment. (*See* Defs.' 56.1 Statement ¶ 16, Ex. R.)

Once again, Raheim does not submit any evidence that shows he was fired for a discriminatory reason. Rather, he simply disputes the various investigations and accusations of wrongdoing made against him by the female employees, investigators, and students. *See James*, 233 F.3d at 157. Specifically, Raheim submits that one of the female complainants, Dovi, submitted "false allegations" against him, and that Dovi "forced" the other females to complain. (*See* Pl.'s 56.1 Resp. ¶ 16, at 21-27.) He submits no admissible evidence to support this assertion.

As to the allegations of cheating, Raheim argues that, prior to the investigation at P.S. 102, he had never been accused of cheating. (Pl.'s 56.1 Resp. ¶ 17.) He further contends that "teachers should make certain that students darken bubbles and completely erase errors and stray marks," and his students were not provided the proper English speaking programs to allow them to pass the various tests. (*Id.*) Finally, Raheim submitted handwritten notes from several students, some accusing him of cheating, and some saying he did not cheat. (*Id.* Ex. 18.) In addition, Raheim suggests that an apparent inconsistency in the investigator's report – that he had been working as the students' teacher since September 1992 instead of February 1, 1993 – is evidence of the investigator's "knowledge of falsity." (*Id.* ¶ 18.)

15

As to the allegations of corporal punishment, Raheim denies that he hit a student. He also denies that the investigators asked him about the incident during their investigation. (*See* Pl.'s 56.1 Resp. ¶ 18.) He also submits that there is no evidence that an ambulance was ever called to the school or that any parents ever complained. (*Id.*) Raheim also quotes from a 1992 memorandum addressing corporal punishment that allows for reasonable physical force by a teacher under certain circumstances. (*Id.*) Raheim also submits evidence from an administrative law judge from the New York State Department of Labor who concluded after a hearing that Raheim did not strike any children. (*Id.*) Finally, Raheim contends that "the Supreme Court has upheld the use of reasonable corporal punishment in schools." (*Id.*)

Viewing the evidence as a whole, and drawing all inferences in plaintiff's favor, the Court concludes that no reasonable jury could find that Raheim was fired from P.S. 102 because of his national origin or religion. Plaintiff submitted hundreds of pages of documents and arguments in support of his contention that summary judgment is unwarranted. Significantly, however, he fails to submit even a scintilla of evidence that the actions by the BOE were based on illegal discrimination. *See Norton*, 145 F.2d at 119; *James*, 233 F.3d at 157. The Court does not take issue with plaintiff's argument that the BOE fired him twice and has done everything in its power to prevent him from teaching again in New York City. These actions, however, do not raise an inference of pretext or discrimination. *See Lizardo*, 270 F.3d at 104; *Estrada v. Lehman Brothers, Inc.*, No. 99 Civ. 8559 (JSM), 2001 WL 43605, at *5 (S.D.N.Y. Jan. 18, 2001) (finding that "[t]he mere fact that [an employee] may disagree with his employer's actions or think that his behavior was justified does not raise an inference of pretext.").

Here, there is no dispute that the Principal of P.S. 102, and certain investigators for the BOE, conducted several investigations of Raheim. There is similarly no dispute that the results of each of these investigations were troubling – that Raheim harassed co-workers, cheated on standardized test, and used corporal punishment against his students. To survive summary judgment, it is not enough for plaintiff to dispute the findings of the investigations against him. He must show that these events were pretextual, and that the real reason the BOE fired him was discriminatory. Plaintiff has not done this. Instead, Raheim has engaged in a line by line dispute of the findings by the Principal of P.S. 102, and the investigators for the BOE. Thus, even if plaintiff is correct that (1) he did not sexually harass four female BOE employees; (2) he did not cheat on standardized tests; and (3) he did not use corporal punishment against his students, his complaints still must be dismissed. *See Lizardo*, 270 F.3d at 104; *Jimoh v. Ernst & Young*, 908 F. Supp. 220, 226 (S.D.N.Y. 1995) (holding that a plaintiff "must do more than simply disagree with defendant's business decisions" to prove discrimination); *see also Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988); *Foxworth v. Am. Bible Soc'y*, No. 03-CV-3005 (MBM), 2005 U.S. Dist. LEXIS 16105, at *21 (S.D.N.Y. July 28, 2005), *aff'd*, No. 05-5266, 2006 U.S. App. LEXIS 12450 (2d Cir. May 16, 2006); *see also Cianfrano*, 851 F. Supp. at 48 (N.D.N.Y. 1994).

No reasonable jury could find that plaintiff was fired from P.S. 102 because of his religion or national origin or that the stated reasons by the BOE were pretextual. Thus, summary judgment is granted as to plaintiff's claims alleging discrimination against the BOE relating to his dismissal from P.S. 104.

## C. RAHEIM'S RETALIATION CLAIMS AGAINST THE BOE

To establish a *prima facie* case of retaliatory discharge, Raheim must show that (1) he was engaged in protected activity; (2) the defendant was aware of that activity; (3) he was discharged; and (4) there was a causal connection between the protected activity and the termination or suspension. *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003). Although the burden that a plaintiff must meet at the *prima facie* stage is *de minimis*, the plaintiff must at least proffer competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. *See Cronin v. Aetna Life Ins.*, 46 F.3d 196, 204 (2d Cir. 1995).

Retaliation claims are similarly governed by the burden-shifting McDonnell Douglas framework. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 764 (2d Cir. 1998); *Tomney v. International Center for Disabled,* 357 F. Supp. 2d 721, 746-47 (S.D.N.Y. 2005). Again, the Court assumes that plaintiff has made out the *prima facie* case required by McDonnell Douglas. The BOE has articulated a legitimate, nondiscriminatory reason for plaintiff's dismissal from P.S. 102, contending that Raheim was discharged by the BOE for a second time for harassing four women, cheating on a standardized test, and engaging in corporal punishment. Thus, the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find retaliation.

Based on this uncontroverted evidence, no reasonable jury could conclude that Raheim was fired in retaliation for exercising his rights under the NYSDHR. *See James*, 233 F.3d at 157; *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 86 (2d Cir. 1990) (holding that a "causal nexus" must be evident for a retaliation claim to survive summary judgment). The record contains no evidence of a connection between Raheim's filing of his NYSDHR claim on May 8, 1991, and the termination of his employment in June 1993. Indeed, over two years passed between the protected activity and alleged retaliatory act. The Second Circuit has not set a bright rule as to when the "temporal link" between the protected activity and the alleged retaliatory act becomes too attenuated to show causation. *See Hill v. Citibank Corp.*, 312 F. Supp. 2d 464, 478-79 (S.D.N.Y. 2004) (no causation when two months have passed); *Hawana v. City of New York*, 230 F. Supp. 2d 518, 530 (S.D.N.Y. 2002) (collecting cases describing proximity in time between the protected activity and the negative employment action). Instead, a "case by case" approach that evaluates "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case" is preferred. *James*, 233 F.3d at 156 (alteration in original). In this case, over two years passed between the two events and, in the meantime, the plaintiff was re-hired by the BOE. Therefore, the Court finds the alleged link between the two events "too attenuated" to show causation.

Here, the record is clear that, after Raheim filed a complaint with the NYSDHR, the BOE agreed to rehire him as a substitute teacher at P.S. 102. This cuts directly against Raheim's contention that he was fired from P.S. 102 for filing a NYSDHR complaint. Instead, the only conclusion is that Raheim was fired from P.S. 102 after several separate allegations of wrongdoing. These allegations were supported by an investigation by the Principal at P.S. 102, a separate investigation by the BOE investigators, and yet another investigation by the Community

17

Superintendent. Thus, the evidence shows that the BOE fired Raheim because of substantiated allegations that he helped students cheat on standardized tests and used corporal punishment against his students, not because he filed a complaint with the NYSDHR.

A reasonable jury could only conclude that plaintiff was fired based upon the BOE's conclusion that plaintiff cheated, engaged in corporal punishment, and harassed his co-workers. *See James*, 233 F.3d at 157. Given this record and the uncontroverted evidence, no reasonable jury could find that Raheim was fired because he filed a complaint with the NYSDHR. Therefore, Raheim's claims of unlawful retaliation are dismissed.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety and both complaints are dismissed. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 17, 2006
Central Islip, NY

\* \* \*

Plaintiff was represented by Ralph P. Casella, Esq., 1794 Richmond Road, Staten Island, New York 10306. Defendants were represented by Joshua Fay, Esq., and Blanche Greenfield, Esq., Michael A. Cardozo, Corporation Counsel of the City of New York, 100 Church Street, New York, New York 10007.